118 T.C. No. 14


UNITED STATES TAX COURT



CHRISTINE M. HACKL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ALBERT J. HACKL, SR., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 6921-00, 6922-00.     Filed March 27, 2002.


     In 1995 and 1996, Ps A and C made gifts to their
children and grandchildren of membership units in
Treeco, LLC, a limited liability company.  Treeco had
previously been organized by A to hold and operate tree
farming properties.  This timberland had been purchased
by A to provide investment diversification in the form
of long-term growth and future income.  Treeco was
governed by an Operating Agreement which set forth the
rights and duties conferred on members and the manager
and which designated A as manager.  At the time of the
gifts, it was correctly anticipated that Treeco and its
successor entities would generate losses and make no
distributions for a number of years.

     <u>Held</u>:  The gifts of Treeco units made by Ps fail
to qualify for the annual gift tax exclusion provided
in sec. 2503(b), I.R.C.

Barton T. Sprunger and Mark J. Richards, for petitioners.

Russell D. Pinkerton, for respondent.


OPINION


NIMS, Judge:  By separate statutory notices, respondent determined a deficiency in the 1996 Federal gift tax liability of petitioner Christine M. Hackl (Christine Hackl) in the amount of $309,866 and in the 1996 Federal gift tax liability of Albert J. Hackl, Sr. (A.J. Hackl), in the amount of $309,950.  Petitioners each timely filed for redetermination by this Court, and, due to an identity of issues, the cases were consolidated for purposes of trial, briefing, and opinion.  In accordance with stipulations of partial settlement filed by the parties, the sole matter remaining for decision is whether gifts made by petitioners of units in a limited liability company qualify for the annual exclusion provided by section 2503(b).

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

These cases were submitted fully stipulated pursuant to Rule 122, and the facts stipulated are so found (except as noted in footnote 1).  The stipulations of the parties, with accompanying

exhibits, are incorporated herein by this reference.  At the time their respective petitions were filed, petitioners resided in Indianapolis, Indiana.

Personal, Educational, and Occupational Background

Petitioners are husband and wife and are the parents of eight children.  As of the date of the gifts at issue, they were also the grandparents of 25 minor grandchildren.

A.J. Hackl was born on December 29, 1925, and Christine Hackl was born on June 16, 1927.  Since obtaining a Bachelor of Mechanical Engineering degree from Georgia Institute of Technology in 1946, A.J. Hackl has pursued a successful career in business.  He was employed by The Trane Company from 1946 to 1959, during which time he became a licensed professional engineer and worked in several management positions.  He next accepted employment with Worthington Corporation, serving in management and executive capacities within the company's air conditioning division from 1959 to 1968.  Then, from 1968 until his retirement in 1995, A.J. Hackl served as chief executive officer of Herff Jones, Inc.  During that period, Herff Jones grew from a small, publicly held manufacturer of scholastic recognition and motivational awards, with $18 million in annual sales, to a national company with a broad line of products and annual sales of $265 million.  At the time of his retirement in 1995, A.J. Hackl owned a significant amount of Herff Jones stock,

which he sold to the company's employee stock ownership plan.  He then remained as chairman of the board of directors until 1998.

Initiation of Tree Farm Investment

In the mid-1990s, in anticipation of the sale of his Herff Jones stock, A.J. Hackl began to research ways to diversify his financial net worth into investments other than publicly traded U.S. marketable securities, of which he had already accumulated a substantial portfolio.  He concluded that an investment in real estate would achieve his objective of diversification and, after consideration of a wide range of real estate ventures, decided that tree farming presented an attractive business opportunity which would both include the acquisition of significant parcels of real estate and also fulfill his interest of remaining personally active in business.

Since his other investments were generating a considerable amount of current income, A.J. Hackl's investment goal with respect to his tree farming business was long-term growth.  He therefore chose to purchase land for use in the tree farming business with little or no existing merchantable timber because such land was significantly cheaper, and would provide a greater long-term return on investment, than land with a substantial quantity of merchantable timber.

In 1995, A.J. Hackl purchased two tree farms:  (1) A 3,813.8 acre tract in Putnam County, Florida (Putnam County Farm) and (2)

a 7,771.88 acre tract in McIntosh County, Georgia (McIntosh County Farm). The Putnam County Farm was purchased on January 6, 1995, for $1,945,038, and contained merchantable timber valued at $140,451 as of the time of purchase. The McIntosh County Farm was purchased on June 23, 1995, and contained no merchantable timber as of that date.

Formation of Treeco, LLC, and Gifting of Interests Therein

A.J. Hackl determined that the tree farming operations should be conducted by a separate business entity (1) to shield his assets not related to the tree farming business from potential liability associated with that business, (2) to create a separate enterprise in which family members could participate, and (3) to facilitate the transfer of ownership interests in the tree farming business to his children, their spouses, and his grandchildren. Accordingly, A.J. Hackl executed Articles of Organization creating Treeco, LLC, and on October 6, 1995, such articles were filed with the Office of the Indiana Secretary of State. As a result, Treeco was duly and validly organized as a limited liability company (LLC) under the Indiana Business Flexibility Act. The LLC format was selected by A.J. Hackl to obtain liability protection for members, to provide protection of assets inside the LLC from members' creditors, to provide pass-through income tax treatment, and to provide for centralized management for the operation of the family tree farming business.

On December 7, 1995, A.J. Hackl contributed the Putnam and McIntosh County Farms to Treeco. Thereafter, on December 11, 1995, petitioners each recorded a capital contribution to Treeco of $500 in exchange for 50,000 voting and 450,000 nonvoting units in the LLC, thereby becoming the initial members of the entity and each holding 50-percent ownership. They also on that date, in their capacities as initial members, executed an Operating Agreement to govern the Treeco enterprise.

The Operating Agreement provided that "Management of the Company's business shall be exclusively vested in a Manager" and specified that such manager "shall perform the Manager's duties as the Manager in good faith, in a manner the Manager reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances." The document designated A.J. Hackl as the initial manager to serve for life, or until resignation, removal, or incapacity, and also conferred on him the authority to name a successor manager during his lifetime or by will.

As regards distributions, the Agreement stated that the manager "may direct that the Available Cash, if any, be distributed to the Members, pro rata in accordance with their respective Percentage Interests." Available cash was defined as cash funds on hand after payment of or provision for all

operating expenses, all outstanding and unpaid current obligations, and a working capital reserve. In addition, the Agreement provided that, prior to dissolution, "no Member shall have the right to withdraw the Member's Capital Contribution or to demand and receive property of the Company or any distribution in return for the Member's Capital Contribution, except as may be approved by the Manager." Members also in the Agreement waived the right to have any company property partitioned.

Concerning changes in members and disposition of membership interests, the Operating Agreement set forth specific terms with respect both to withdrawal of members and transfer of membership interests. Members could not withdraw from Treeco without the prior consent of the manager. However, under the Agreement "A Member desiring to withdraw may offer his Units for sale to the Company, in the person of the Manager, who shall have exclusive authority on behalf of the Company to accept or reject the offer, and to negotiate terms." Pertaining to transfer of interests, the document recited as follows:

> No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of the Member's Interest except with the prior written consent of the Manager, which consent may be given or withheld, conditioned or delayed as the Manager may determine in the Manager's sole discretion.

If a transfer was permitted in accordance with this provision, the transferee would have the right to be admitted as a substitute member. If a transfer was made in violation of the

foregoing procedure, the transferee would be afforded no opportunity to participate in the business affairs of the entity or to become a member; rather, he or she would only be entitled to receive the share of profits or distributions which otherwise would have inured to the transferor.

Among the rights afforded to members by the Operating Agreement were the following: (1) Voting members had the right to remove the manager and elect a successor by majority vote; (2) voting members had the right to amend the Operating Agreement by an 80-percent majority vote; (3) voting and nonvoting members had the right to access the books and records of the company; (4) voting and nonvoting members had the right jointly to decide whether the company would be continued following an event of dissolution; and (5) after the tenure of A.J. Hackl as manager, voting members could dissolve the company by an 80-percent majority vote.

As set forth in the Operating Agreement, Treeco was to be dissolved upon the first to occur of four enumerated circumstances:

> (i) While A.J. Hackl is the Manager, by his written determination that the Company should be dissolved;

> (ii) Following the tenure of A.J. Hackl as Manager by a written determination by Voting Members owning not less than eighty percent (80%) of the Voting Units of the Company that the Company should be dissolved;

(iii)  The occurrence of a Dissolution Event [defined as "the resignation, expulsion, bankruptcy, death, insanity, retirement, or dissolution of the Manager"] if the Company is not continued * * * [by a majority vote of the members within 90 days of the event]; or

(iv) At such earlier time as may be provided by applicable law.

Upon dissolution, distributions in liquidation were to be made first to creditors, then to repay member loans, and finally to members with positive capital account balances in proportion thereto.

Subsequent to completion of the foregoing formalities, petitioners on December 22, 1995, made further contributions to Treeco.  On that date petitioners contributed cash in the amount of $5,000,000 and publicly traded securities valued at $2,918,956.  The cash and securities were held by Treeco to serve as working capital and to finance additional purchases of tree farm property.

Then, on December 29, 1995, petitioners commenced a program of gifting interests in Treeco to family members.  Petitioners transferred 500 voting and 700 nonvoting units in Treeco to each of their eight children and to the spouse of each such child.  At that time, each donee executed an acceptance of the Treeco Operating Agreement.  Petitioners reported the 1995 gifts of Treeco units on timely filed gift tax returns and elected on those returns to treat the gifts as made one-half by each of the

petitioners pursuant to section 2513.  Petitioners also treated the gifts as qualifying for the annual exclusion of section 2053(b).  Respondent did not issue notices of deficiency to petitioners for 1995.

On January 18, 1996, Treeco purchased a third property in Flager County, Florida (Flager County Farm), using $5,750,436 of the LLC's cash and securities.  The Flager County Farm consisted of 8,382 acres and contained merchantable timber valued at $23,638 at the time of sale.

Thereafter, on March 5, 1996, petitioners continued their program of gifting Treeco units with the gifts that are at issue in this litigation.  Petitioners once again each gave 500 voting and 750 nonvoting units in Treeco to each of their eight children and to the spouses of such children.  Also on that date, A.J. Hackl created the Albert James Hackl Irrevocable Trust (Grandchildren's Trust), for the benefit of petitioners' minor grandchildren.  At that time, petitioners each transferred 31,250 nonvoting units in Treeco to the Grandchildren's Trust, representing 1,250 units for each of their 25 minor grandchildren.  Three of petitioners' children were named as trustees of the Grandchildren's Trust and in that capacity executed an acceptance of the Treeco Operating Agreement. Petitioners reported the gifts made in 1996 on timely filed gift tax returns and elected on those returns to treat the gifts as

made one-half by each of them pursuant to section 2513.  As previously, annual exclusions were claimed under section 2503(b) with respect to the gifts.  Respondent disallowed the exclusions by separate notices of deficiency dated April 14, 2000.

Operations of Treeco, LLC, and Successor Entities

On December 19, 1996, A.J. Hackl organized Hacklco, LLC, a Georgia limited liability company, and in 1997, Treeco was dissolved and merged into Hacklco, LLC.  Similarly, on May 20, 1997, Treesource, LLLP, a Georgia limited liability limited partnership, was organized, and Hacklco was merged into this entity in 1998.  These changes appear to have wrought no alteration in the nature and operation of the Treeco enterprise and, while enumerated for clarity, do not affect our analysis of the gifted units.  Petitioners continued making gifts of voting and nonvoting units of Treeco's successors in interest in 1997 and 1998, resulting in petitioners' children and their spouses owning, at all times subsequent to January 2, 1998, 51 percent of the voting power of Treesource.

Treeco and its successors have at all times actively engaged in tree farming.  Since operations commenced in 1995, Treeco and its successors have planted approximately 8 to 10 million trees on their lands.  A.J. Hackl, as manager of Treeco and its successors, devotes approximately 750 to 1000 hours per year to the farming operations.  In addition, Georgia Pacific Corporation

and F & W Forestry Services, Inc., were retained by Treeco to provide consulting and management services for the tree farms. Contained in the record are a Five-Year Timber Operating Budget for the McIntosh County Farm, prepared by F & W Forestry Services, and detailed forest management plans for the Putnam and Flager County Farms, prepared by Georgia Pacific. These documents discuss, among other things, plantation thinning, reforestation, fertilization, and capital improvements. The F & W Forestry Services budget projects losses through 2000 but characterizes the McIntosh tract as having "great future income potential". The Georgia Pacific plan describing the Putnam property similarly states: "These recommendations, if followed, will provide you with a healthy, fast growing forest which will lead to a steady stream of income in the future." A.J. Hackl meets on a regular basis with consultants from Georgia Pacific and F & W Forestry Services regarding maintenance of the tree farms. The parties have stipulated that he has always managed Treeco and its successors with such care as an ordinarily prudent person in a like position would use under similar circumstances.

The primary business purpose of all three of the above entities has been to acquire and manage plantation pine forests for long-term income and appreciation for petitioners and their heirs and not to produce immediate income. Petitioners anticipated that all three entities would operate at a loss for a

number of years, and therefore, they did not expect that these entities would be making distributions to members during such years.  Treeco reported losses in the amounts of $42,912, $121,350, and $23,663 during 1995, 1996, and 1997, respectively.  Hacklco reported losses of $52,292 during 1997.  Treesource reported losses in the amounts of $75,179, $153,643, and $95,156[1] in 1997, 1998, and 1999, respectively.  Neither Treeco nor its successors had at any time through April 5, 2001, generated net profits or made distributions of cash or other property to members.

Discussion

## I.  Settled and Disputed Issues

The parties have previously filed a Stipulation of Partial Settlement, and a Supplemental Stipulation of Partial Settlement, in which they agreed that the fair market value of both the voting and nonvoting units of Treeco, LLC, was $10.43 per unit on the date of the 1996 gifts at issue in these cases.  Accordingly, the sole issue for determination by the Court is whether petitioners' gifts of units in Treeco qualify for the annual exclusion provided by section 2503(b), a dispute which turns on

---

[1] Although the parties stipulated that Treesource reported a loss of $99,156 for 1999, Treesource's 1999 return in fact reflects a loss of $95,156.  See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989) (holding that stipulations are properly disregarded where clearly contrary to evidence contained in the record).

whether the transfers constitute gifts of a present interest for purposes of the statute.  In this connection, the parties have also stipulated that the Grandchildren's Trust satisfies the requirements of section 2503(c) such that the annual exclusion will be applicable for gifts thereto provided that the gifts are otherwise determined to be of a present interest.

Additionally, to further clarify the issues, the parties have stipulated that if the aforesaid question is decided in petitioners' favor, then in computing gift tax liability for 1996, the amounts of prior period taxable gifts reported on petitioners' 1996 returns shall be accepted as filed.  Conversely, if the above question is decided in favor of respondent, the amounts of prior period taxable gifts reported on petitioners' 1996 returns shall be increased to reflect the annual exclusions claimed by petitioners for gifts of Treeco units in 1995.

II.  Statutory and Regulatory Law

Section 2501 imposes a tax for each calendar year "on the transfer of property by gift" by any taxpayer, and section 2511(a) further clarifies that such tax "shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible".  The tax is computed based upon the statutorily defined "taxable gifts", which term is explicated in section

2503.  Section 2503(a) provides generally that taxable gifts

means the total amount of gifts made during the calendar year,

less specified deductions.  Section 2503(b), however, excludes

from taxable gifts the first $10,000 "of gifts (other than gifts

of future interests in property) made to any person by the donor

during the calendar year".  In other words, the donor is entitled

to an annual exclusion of $10,000 per donee for present interest

gifts.

Regulations promulgated under section 2503 further elucidate

this concept of present versus future interest gifts, as follows:

> Future interests in property.--(a) No part of the
> value of a gift of a future interest may be excluded in
> determining the total amount of gifts made during the
> "calendar period" * * *.  "Future interest" is a legal
> term, and includes reversions, remainders, and other
> interests or estates, whether vested or contingent, and
> whether or not supported by a particular interest or
> estate, which are limited to commence in use,
> possession, or enjoyment at some future date or time.
> The term has no reference to such contractual rights as
> exist in a bond, note (though bearing no interest until
> maturity), or in a policy of life insurance, the
> obligations of which are to be discharged by payments
> in the future.  But a future interest or interests in
> such contractual obligations may be created by the
> limitations contained in a trust or other instrument of
> transfer used in effecting a gift.
>
> (b) An unrestricted right to the immediate use,
> possession, or enjoyment of property or the income from
> property (such as a life estate or term certain) is a
> present interest in property. * * * [Sec. 25.2503-3,
> Gift Tax Regs.]

III.  Caselaw Development

The foregoing statutory and regulatory pronouncements have been the subject of repeated interpretation by the Federal courts.  Much of the litigation has occurred in the factual context of gifts in trust, including a series of seminal decisions by the Supreme Court in the 1940s.  Commissioner v. Disston, 325 U.S. 442 (1945); Fondren v. Commissioner, 324 U.S. 18 (1945); Ryerson v. United States, 312 U.S. 405 (1941); United States v. Pelzer, 312 U.S. 399 (1941); Helvering v. Hutchings, 312 U.S. 393 (1941); see also Calder v. Commissioner, 85 T.C. 713 (1985); Blasdel v. Commissioner, 58 T.C. 1014 (1972), affd. 478 F.2d 226 (5th Cir. 1973).  Additionally, parallel to the developments in the trust area and incorporating many of the same principles, a line of cases has addressed the related situation where transfers of property are made to an entity with preexisting interest-holders.  See, e.g., Stinson Estate v. United States, 214 F.3d 846 (7th Cir. 2000); Chanin v. United States, 183 Ct. Cl. 840, 393 F.2d 972 (1968).

In both scenarios, the gift in question takes the form of an indirect gift of the underlying property to the beneficiaries of the trust or to those holding interests in the entity.  Helvering

v. Hutchings, supra at 398; Chanin v. United States, supra at 975; Blasdel v. Commissioner, supra at 1022.  Furthermore, it has become well settled that to qualify as a present interest, such a gift must confer on the donee not just vested rights but a substantial present economic benefit by reason of use, possession, or enjoyment of either the property itself or income from the property.  Fondren v. Commissioner, supra at 20-21; Estate of Holland v. Commissioner, T.C. Memo. 1997-302.

The cases have also established through oft-repeated directives that where the use, possession, or enjoyment is postponed to the happening of a contingent or uncertain future event, such as where distributions of property or income will occur only at the discretion of a trustee or upon joint action of entity interest holders, or where there is otherwise no showing from facts and circumstances of a steady flow of funds from the trust or entity, the gift will fail to qualify for the section 2503(b) exclusion.  Commissioner v. Disston, supra at 449; Ryerson v. United States, supra at 406-408; United States v. Pelzer, supra at 403-404; Chanin v. United States, supra at 976; Calder v. Commissioner, supra at 727-730.

The taxpayer bears the burden of showing that the gift at issue is other than of a future interest.[2]  Rule 142(a); Commissioner v. Disston, supra at 449; Stinson Estate v. United States, supra at 848.

IV.  Contentions of the Parties

Against the foregoing background, we turn to the contentions of the parties before us.  Petitioners contend their transfers of units in Treeco are properly characterized as present interest gifts.  Petitioners emphasize that they made direct, outright transfers of the Treeco units, which are personal property separate and distinct under Indiana law from Treeco's assets. Petitioners further maintain that the units had a substantial and stipulated value; that petitioners' transfers placed no restrictions on the donees' interests in the units; and that the donees upon transfer acquired all rights in and to the gifted units, which rights were identical to those petitioners had in the units they retained.  Hence, according to petitioners, their transfers involved no postponement of rights, powers, or privileges that would cause the gifts to constitute future interests.

---

[2] Cf. sec. 7491, which is effective for court proceedings that arise in connection with examinations commencing after July 22, 1998, and which can operate to place the burden on the Commissioner in enumerated circumstances.  Petitioners here have not contended, nor is there evidence, that their examinations commenced after July 22, 1998, or that sec. 7491 applies in these cases.

Petitioners also argue that the cases involving indirect transfers through trusts and corporations are inapplicable to the direct transfers at issue here.  Petitioners allege:

> When an equity interest in a business (or any property) is transferred outright, the donee receives all rights in and to the equity interest (or other property) upon transfer, whatever those rights may be. The lack of any "postponement" of the donee's rights to enjoyment of the equity interest (or other property) is manifestly clear. * * *

From the foregoing premise, petitioners maintain that the standards referenced to analyze whether rights are postponed when interests in the subject property are held only indirectly through the conduit of a trust or corporate entity have no place in the present situation.

Conversely, respondent argues that petitioners' transfers of Treeco units fail to qualify as gifts of present interests. Respondent avers that because of the restrictions contained in the Treeco Operating Agreement, the transfers fell short of conferring on the donees the requisite immediate and unconditional rights to the use, possession, or enjoyment of property or the income from property.  Unlike petitioners, respondent finds the body of law regarding indirect transfers to constitute "substantial analogous authority" and the principles espoused therein to control the outcome of these cases. Specifically, respondent emphasizes the requirement of present economic benefit and contends that the inability of the donees to

freely transfer the units or to compel distributions from the entity prevented them from receiving any such benefit on account of the transfers. Thus, in respondent's view, the gifts postponed any economic benefit and therefore were of future interests.

## V. Analysis

### A. Applicable Standards

As framed by the parties' contentions, a threshold issue we must address is the extent to which the standards expressed in the decided cases interpreting section 2503(b) are pertinent here. As petitioners correctly note, the property with which we are concerned in this matter is an ownership interest in an entity itself, rather than an indirect gift in property contributed to the entity. Treeco was duly organized and operating as an LLC, units of which under Indiana law are personal property separate and distinct from the LLC's assets. See Ind. Code Ann. secs. 23-18-1-10, 23-18-6-2 (West 1994). Nonetheless, while State law defines property rights, it is Federal law which determines the appropriate tax treatment of those rights. United States v. Natl. Bank of Commerce, 472 U.S. 713, 722 (1985); Knight v. Commissioner, 115 T.C. 506, 513 (2000). It thus is Federal law which controls whether the property rights granted to the donees as LLC owners under State

law were sufficient to render the gifts of present interests within the meaning of section 2503(b).  See United States v. Pelzer, 312 U.S. at 402-403.

Moreover, we conclude that the relevant body of Federal authority encompasses the general interpretive principles developed through the extensive litigation involving indirect gifts.  To disregard longstanding directives that a present interest gift exists only where a donee receives noncontingent, independently exercisable rights of substantial economic benefit cannot be justified in the face of either the language used by the Supreme Court or the subsequent application of such language.  See Fondren v. Commissioner, 324 U.S. at 20-21; Ryerson v. United States, 312 U.S. at 408; United States v. Pelzer, supra at 403-404.

For example, in Fondren v. Commissioner, supra at 20-21, the Court explains the meaning of future versus present interest in general terms, stating:

> it is not enough to bring the exclusion into force that
> the donee has vested rights.  In addition he must have
> the right presently to use, possess or enjoy the
> property.  These terms are not words of art, like "fee"
> in the law of seizin * * *, but connote the right to
> substantial present economic benefit.  The question is
> of time, not when title vests, but when enjoyment
> begins.  Whatever puts the barrier of a substantial
> period between the will of the beneficiary or donee now
> to enjoy what has been given him and that enjoyment
> makes the gift one of a future interest within the
> meaning of the regulation.

The Court thus says that the terms "use, possess or enjoy" connote the right to substantial present economic benefit.  This phraseology is broad and is in no way limited to the factual context presented.  It defines the root words of the regulatory standard which no party disputes is a generally applicable and valid interpretation of section 2503(b).  See sec. 25.2503-3, Gift Tax Regs.  We therefore would be hard pressed to construe "use, possession, or enjoyment" as meaning something different or less than substantial present economic benefit simply because of a shift in the factual scenario or form of gift to which the test is being applied.  Accordingly, we are satisfied that section 2503(b), regardless of whether a gift is direct or indirect, is concerned with and requires meaningful economic, rather than merely paper, rights.

Furthermore, this idea is buttressed by recognition that in an earlier case we quoted the very language from Fondren v. Commissioner, supra, set forth above in a context that involved outright gifts.  In Estate of Holland v. Commissioner, T.C. Memo. 1997-302, we quoted the Fondren text en route to concluding that outright gifts in the form of $10,000 checks, which had been properly endorsed and deposited, were gifts of a present interest.

In a similar vein, previous caselaw from this Court reveals that the principles established in United States v. Pelzer, supra

at 403-404, and <u>Ryerson v. United States</u>, <u>supra</u> at 408, regarding contingency and joint action are not restricted in their applicability to indirect gift situations. In <u>Skouras v. Commissioner</u>, 14 T.C. 523, 524-525 (1950), affd. 188 F.2d 831 (2d Cir. 1951), the taxpayer assigned outright all incidents of ownership in several insurance policies on his life to his five children jointly and continued to pay the premiums thereon. Given these facts, we, citing <u>United States v. Pelzer</u>, <u>supra</u>, stated broadly that "where the use, possession, or enjoyment of the donee is postponed to the happening of future uncertain events the interest of the donee is a future interest within the meaning of the statute." <u>Id.</u> at 533. Then, relying on <u>Ryerson v. United States</u>, <u>supra</u>, and in spite of the taxpayer's argument that "there was not a grant to trust as in the <u>Ryerson</u> case", we ruled that the taxpayer, by "making the assignments to his five children jointly, had postponed the possession and enjoyment of the rights and interests in and to the policies or the proceeds thereof until his death or until such time as the children, acting jointly, might change or negative the action he had thus taken." <u>Id.</u> at 534.

In sum, we reject petitioners' contention that when a gift takes the form of an outright transfer of an equity interest in a business or property, "No further analysis is needed or justified." To do so would be to sanction exclusions for gifts

based purely on conveyancing form without probing whether the donees in fact received rights differing in any meaningful way from those that would have flowed from a traditional trust arrangement.

Petitioners' advocated approach could also lead to situations where gift tax consequences turned entirely upon distinctions in the ordering of transactions, rather than in their substance. For example, while petitioners contributed property to an LLC and then gifted ownership units to their children and grandchildren, a similar result could have been achieved by first transferring ownership units and then making contributions to the entity. Yet petitioners would apparently have us decide that the latter scenario falls within the rubric of established precedent while the former is independent thereof. We decline to take such an artificial view.

We are equally unconvinced by petitioners' attempts to avoid the principles discussed above with the assertion that

> the postponement question deals with **rights** to present use, possession or enjoyment of the transferred property, not the likelihood of the actual use, possession, or enjoyment of the property. See, Estate of Cristofani v. Comm'r, 97 T.C. 74 (1991); Crummey v. Comm'r, 397 F.2d 82 (9th Cir. 1968); Kieckhefer v. Comm'r, 189 F.2d 118 (7th Cir. 1951); Gilmore v. Comm'r, 213 F.2d 520, 522 (6th Cir. 1954) * * *

Each of the above-cited cases involved trusts in which beneficiaries were given an absolute right to demand distributions and have not been interpreted to establish a rule

inconsistent with those enunciated by the Supreme Court.  See
Rassas v. Commissioner, 196 F.2d 611, 613 (7th Cir. 1952)
(distinguishing Kieckhefer v. Commissioner, supra), affg. 17 T.C.
160 (1951).  Thus, instead of adopting an approach which would
undermine the purpose and integrity of the section 2503(b)
exclusion, we for the reasons explained above conclude that
petitioners are not by virtue of making outright gifts relieved
of showing that such gifts in actuality involved rights
consistent with the standards for a present interest set forth in
regulations and existing caselaw.

To recapitulate then, the referenced authorities require a
taxpayer claiming an annual exclusion to establish that the
transfer in dispute conferred on the donee an unrestricted and
noncontingent right to the immediate use, possession, or
enjoyment (1) of property or (2) of income from property, both of
which alternatives in turn demand that such immediate use,
possession, or enjoyment be of a nature that substantial economic
benefit is derived therefrom.  In other words, petitioners must
prove from all the facts and circumstances that in receiving the
Treeco units, the donees thereby obtained use, possession, or
enjoyment of the units or income from the units within the above-
described meaning of section 2503(b).

B. <u>Application to the Gifted Property</u>

Beginning with the property itself, we reiterate that the donees in these cases did receive, at least in the sense of title, outright possession of the Treeco units. Nonetheless, as previously explained, the simple expedient of paper title does not in and of itself create a present interest for purposes of section 2503(b) unless all the facts and circumstances establish that such possession renders an economic benefit presently reachable by the donees. It therefore is incumbent upon petitioners to show the present (not postponed) economic benefit imparted to the donees as a consequence of their receipt of the Treeco units.

In considering this issue, we first address the role of the Treeco Operating Agreement in our analysis. Petitioners state that each gifted Treeco unit "represented a significant bundle of legal rights in the venture, rights which are defined by the Operating Agreement, Treeco's Articles of Organization, and Indiana statutory and common law". At the same time, petitioners aver: "The postponement question is not concerned with contractual rights inherent in the transferred **property**, but rather in whether, in the **transfer** of the property, the transferor imposed limitations or restrictions on the present enjoyment of the property." They then go on to quote the language from section 25.2503-3(a), Gift Tax Regs., which

references contractual rights in a bond, note, or insurance policy that do not result in a future interest characterization. Hence, while petitioners seem to acknowledge that the Operating Agreement in large part defines the nature of the property received by the donees, they also apparently would have us ignore any provisions of the Agreement which limited the ability of the donees to presently recognize economic value as akin to the contractual rights mentioned in the regulation.

However, petitioners' reliance on section 25.2503-3(a), Gift Tax Regs., is misplaced. This Court has previously taken a much narrower view of the cited regulatory language. In Estate of Vose v. Commissioner, T.C. Memo. 1959-175, vacated and remanded on another issue 284 F.2d 65 (1st Cir. 1960), we opined that the regulations were "designed to cover notes and bonds which, although perhaps not containing all of the attributes of negotiable instruments, are at least definitely enforceable legal obligations payable on a day certain and immediately disposable by the obligee." LLC units hardly fall within these parameters, and we observe that the quoted reasoning is consistent with our focus on requiring some presently reachable economic benefit.

Furthermore, petitioners' attempts to find in these regulations support for a distinction between limitations contractually inherent in the transferred property and restrictions imposed upon transfer are not well taken. All facts

and circumstances must be examined to determine whether a gift is of a present interest within the meaning of section 2503(b), and this will be true only where all involved rights and restrictions, wherever contained, reveal a presently reachable economic benefit. Since here the primary source of such rights and restrictions is the Treeco Operating Agreement, its provisions, in their cumulative entirety, must largely dictate whether the units at issue conferred the requisite benefit. Accordingly, we now turn to the Operating Agreement to flesh out the nature of the property rights transferred to the donees at the time of their receipt of the Treeco units and whether such rights rose to the level of a present interest on account of either the units themselves (considered in this section) or the income therefrom (considered in section IV.C., infra).

Petitioners offer the following summary of the rights inuring to the donees upon their receipt of the LLC units:

> Upon transfer the Donees acquired membership rights and obligations in the gifted Treeco units which were identical to those which Petitioners had in the Treeco units they retained, including the rights under the Treeco Operating Agreement to have all net income or capital gains allocated, all cash distributions made, and net loss allocated (subject to an allocation of losses to A.J. Hackl for a period which was designed to ensure the current deductibility of Treeco losses for federal income tax purposes) based on the number of units held in relation to the total number of units, the right to have capital accounts established and maintained on behalf of each member in the manner provided by Treas. Reg. § 1.704-1(b)(2)(iv), the right to offer units for sale to Treeco, or to sell their units to third parties (subject to manager approval),

the rights (voting members) to remove the manager, amend Treeco's organizational documents, dissolve Treeco, approve salaries or bonuses paid to any manager, etc., all of which rights are entitled to court enforcement. * * *

At the outset, we note that petitioners' repeated assertions that the rights conferred on the donees were identical to those retained by the donors have little bearing on our analysis. A similar fact did not dissuade us from finding only a future interest in Blasdel v. Commissioner, 58 T.C. 1014 (1972), and we are satisfied that it should be given no more weight here.

The taxpayers in Blasdel v. Commissioner, supra at 1015-1016, 1018, created a trust, named themselves as 2 of the trust's beneficiaries, and conveyed beneficial interests to 18 other family members. Although we explicitly observed that "the donees acquired their fractional beneficial interests subject to the same terms and limitations as petitioners held theirs", we nonetheless based our decision on the nature of those terms, without regard to any identity of rights between donors and donees. Id. at 1018-1020; see also Hamilton v. United States, 553 F.2d 1216, 1218 (9th Cir. 1977). In addition, given the authority granted here to A.J. Hackl as manager, we observe that the alleged equality, when viewed from a practical standpoint, is less than petitioners would have us believe.

Concerning the specific rights granted in the Operating Agreement, we are unable to conclude that these afforded a

substantial economic benefit of the type necessary to qualify for the annual exclusion. While we are aware of petitioners' contentions and the parties' rather conclusory stipulations that Treeco was a legitimate operating business entity and that restrictive provisions in the Agreement are common in closely held enterprises and in the timber industry, such circumstances (whether or not true) do not alter the criteria for a present interest or excuse the failure here to meet those criteria.

As we consider potential benefits inuring to the donees from their receipt of the Treeco units themselves, we find that the terms of the Treeco Operating Agreement foreclosed the ability of the donees presently to access any substantial economic or financial benefit that might be represented by the ownership units. For instance, while an ability on the part of a donee unilaterally to withdraw his or her capital account might weigh in favor of finding a present interest, here no such right existed. According to the Agreement, capital contributions could not be demanded or received by a member without the manager's consent. Similarly, a member desiring to withdraw could only offer his or her units for sale to the company; the manager was then given exclusive authority to accept or reject the offer and to negotiate terms. Hence some contingency stood between any individual member and his or her receipt from the company of economic value for units held, either in the form of approval

from the current manager or perhaps in the form of removal of that manager by joint majority action, followed by the appointment of and approval from a more compliant manager. Likewise, while a dissolution could entitle members to liquidating distributions in proportion to positive capital account balances, no donee acting alone could effectuate a dissolution.

Moreover, in addition to preventing a donee from unilaterally obtaining the value of his or her units from the LLC, the Operating Agreement also foreclosed the avenue of transfer or sale to third parties. The Agreement specified that "No Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of the Member's Interest except with the prior written consent of the Manager, which consent may be given or withheld, conditioned or delayed as the Manager may determine in the Manager's sole discretion." Hence, to the extent that marketability might be relevant in these circumstances, as potentially distinguishable on this point from those in indirect gift cases such as <u>Chanin v. United States</u>, 393 F.2d at 977, and <u>Blasdel v. Commissioner</u>, <u>supra</u> at 1021-1022 (both dismissing marketability as insufficient to create a present interest where the allegedly marketable property, an entity or trust interest, differed from the underlying gifted property), the Agreement, for all practical

purposes, bars alienation as a means for presently reaching economic value. Transfers subject to the contingency of manager approval cannot support a present interest characterization, and the possibility of making sales in violation thereof, to a transferee who would then have no right to become a member or to participate in the business, can hardly be seen as a sufficient source of substantial economic benefit. We therefore conclude that receipt of the property itself, the Treeco units, did not confer upon the donees use, possession, or enjoyment of property within the meaning of section 2503(b).

C.  Application to Income From the Gifted Property

Turning then to whether the gifts of Treeco units afforded to the donees the right to use, possession, or enjoyment of income therefrom, we again answer this question in the negative. As before, broadly applicable standards and reasoning derived from both the trust cases and the cases involving gifts to a partnership or corporate entity call for this result.

In particular, this Court has distilled caselaw in these areas into a three-part test for ascertaining whether rights to income satisfy the criteria for a present interest under section 2503(b). Calder v. Commissioner, 85 T.C. at 727-728. The taxpayer must prove, based on surrounding circumstances and the trust agreement: "(1) That the trust will receive income, (2) that some portion of that income will flow steadily to the

beneficiary, and (3) that the portion of income flowing out to the beneficiary can be ascertained."  Id.; see also Md. Natl. Bank v. United States, 609 F.2d 1078, 1080-1081 (4th Cir. 1979).

Here, the parties stipulated that the primary business purpose of Treeco and its successors was to acquire and manage timberland for long-term income and appreciation, "and not to produce immediate income."  The parties further stipulated: "Petitioners anticipated that all three entities would operate at a loss for a number of years, and therefore, they did not expect that these entities would be making distributions to members during such years."  The record then validates these assumptions by stipulating to losses, negative cashflows, and an absence of distributions from 1995 to April of 2001.  Hence, even the first receipt of income prong has not been established on the facts before us.

Furthermore, even if petitioners had shown that Treeco would generate income at or near the time of the gifts, the record fails to establish that any ascertainable portion of such income would flow out to the donees.  Members would receive income from Treeco only in the event of a distribution.  However, the Operating Agreement states that distributions were to be made in the manager's discretion.  This makes the timing and amount of distributions a matter of pure speculation and also raises again the specter of some form of joint action to oust a manager whose

distribution policy failed to satisfy members.  As a result, the facts in this case convince us that any economic benefit the donees may ultimately obtain from their receipt of the Treeco units is future, not present.  In other words, the economic benefit has been postponed in a manner contrary to the regulatory and judicial pronouncements establishing the meaning of a present interest gift for purposes of section 2503(b).

Additionally, we note that the fact the parties have stipulated a value for the Treeco units does not affect the foregoing analysis.  Although petitioners mention this fact repeatedly, it has long been established that "the crucial thing is postponement of enjoyment, not the fact that the beneficiary is specified and in esse or that the amount of the gift is definite and certain."  Fondren v. Commissioner, 324 U.S. at 26-27.  Entity interest values can be based, as the facts and circumstances indicate is the case here, on the worth of underlying assets and the future income potential they represent, neither of which may be presently reachable.  We therefore hold that petitioners are not entitled to exclusions under section 2503(b) for their gifts of Treeco units.

To reflect the foregoing,

Decisions will be entered under Rule 155.