T.C. Memo. 2015-249

UNITED STATES TAX COURT

ESTATE OF BARBARA M. PURDUE, DECEASED, WILLIAM J. PURDUE, SUSAN P. CHRISTOFF, NANCY P. MYHRE, AND HAZEL P. BEATTY, STATUTORY EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF BARBARA M. PURDUE, DECEASED, DONOR, WILLIAM J. PURDUE, SUSAN P. CHRISTOFF, NANCY P. MYHRE, AND HAZEL P. BEATTY, STATUTORY EXECUTORS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12994-12, 29829-12.          Filed December 28, 2015.

George W. Akers, Jr., and Alan L. Montgomery, for petitioners.

Nick G. Nilan and Alicia H. Eyler, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge: Respondent determined an estate tax deficiency of

$3,121,959 with respect to the Estate of Barbara M. Purdue (estate), and gift tax

[*2] deficiencies of $112,303, $184,718, $133,196, $169,706, $176,844, and $149,040 for the taxable years 2001, 2002, and 2004 through 2007, respectively. After settlement of certain issues, the issues remaining are:

(1) whether the value of the assets transferred by Barbara M. Purdue (decedent) to the Purdue Family LLC (PFLLC) is includible in the value of her gross estate under sections 2036(a) and 2035(a).[1]  We hold that it is not;

(2) whether decedent's gifts of PFLLC interests from 2001 through 2007 to the Purdue Family Trust (PFT) are present interest gifts which qualify for exclusion under section 2503(b).  We hold that they are; and

(3) whether the estate is entitled to deduct interest on loans from the beneficiaries of the estate used to pay the estate tax liabilities.  We hold that it is.

FINDINGS OF FACT

Decedent was a resident of Washington when she died on November 27, 2007, at the age of 95.  Four of the five Purdue children, William J. Purdue, Susan P. Christoff, Nancy P. Myhre, and Hazel P. Beatty (Purdue children), are personal representatives of the estate.  Three of the four representatives also resided in Washington when the petition was filed; the fourth resided in Colorado.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** <u>The Purdue Family</u>

Decedent was married to Robert A. Purdue (Mr. Purdue) and had five children and multiple grandchildren and great-grandchildren. Mr. Purdue was an attorney and a founding partner of Montgomery Purdue Blankinship & Austin PLLC (MPBA). Decedent was a homemaker, and her participation in the control and management of the PFLLC assets was limited.

Mr. Purdue invested in Tele-Vue Systems, Inc. (Tele-Vue), a pioneering cable company, when it was a startup company in the 1960s for a nominal value. Tele-Vue was acquired in 1969 by Columbia Broadcasting System in an income tax-free exchange. Substantially all of the low-basis telecommunications stocks were derived from that exchange, and later related income tax-free spin-offs and in-kind stock distributions.

At the end of 1999 decedent and Mr. Purdue (parents) had a net worth of approximately $28 million, consisting mostly of marketable securities worth approximately $24 million. In 2000 the marketable securities were held in five different brokerage accounts at three management firms. The three separate management firms provided independent advice to Mr. Purdue; the management firms did not consult with one another or consider Mr. Purdue's assets managed by the other firms.

[*4]   The parents also had an undivided one-sixth interest in a commercial building in Honolulu, Hawaii (Hocking Building), valued at approximately $480,000 as of December 1999.  The Hocking Building was subject to a 55-year triple net lease through 2022 and has been managed by a real estate management firm since 1982.

In 1995 the parents engaged Alan Montgomery, an attorney and member at MPBA, for estate and gift tax planning and advice.  To reduce estate tax Mr. Montgomery advised the parents to use their available gift and estate tax exemptions and exclusions, generation-skipping transfer tax exemptions, and gift and estate tax valuation discounts.  In a letter summarizing the recommendations Mr. Montgomery also suggested that they form a family limited partnership to hold their stock interests and their interest in the Hocking Building to centralize management and take advantage of valuation discounts.

The PFLLC

The parents requested that the Purdue children receive copies of most or all of the MPBA correspondence commencing in early 2000.  On January 20, 2000, Mr. Montgomery recommended various estate planning strategies, including the creation of an irrevocable family gift trust, qualified personal residence trusts, and a member-managed Washington family limited liability company.  Mr.

[*5] Montgomery noted that it was not necessary for Mr. Purdue or decedent to absorb all of the information but strongly recommended that the Purdue children do so.  Included in the memorandum was a draft of the PFLLC operating agreement.  The purposes stated in the draft agreement, identical to those in the final agreement, were to:  (1) consolidate the management and control of certain property and improve the efficiency of the management by holding the properties in a single, flexible entity; (2) avoid fractionalization of ownership; (3) keep ownership of the assets within the extended family; (4) protect assets from unknown future creditors; (5) provide flexibility in management of assets not available through other business entities; and (6) promote education of, and communication among, members of the extended family with respect to financial matters.

On August 2, 2000, the parents formed the PFLLC and the Purdue Family Residence Trusts (PFRTs).  Decedent retained the right to income and distributions from the property she transferred to the PFLLC in proportion to her PFLLC ownership percentage.  The following day MPBA sent the parents and the Purdue children a memorandum, again recommending that the Purdue children study the information.  The memorandum noted the tax savings the PFLLC could provide the parents as one of the five advantages to the formation of the PFLLC.

[*6] The memorandum describes four nontax business reasons: (1) limited liability; (2) passthrough income taxation; (3) minimal formalities; and (4) the LLC's being an ideal entity for owning real estate. On or around August 14, 2000, the parents transferred their respective 50% interests in the Purdue residence, then appraised for $2,800,000, to the PFRTs.

On or around August 25, 2000, the parents lent $375,000 to Beverly Purdue in exchange for a demand promissory note secured by a mortgage on a beach house in Delaware, acquired by Beverly Purdue with the loan. In November 2000 the parents funded the PFLLC by contributing $22 million of marketable securities, their interest in the Hocking Building valued at approximately $900,000, a $375,000 promissory note from Beverly Purdue, and an $865,523 certificate of deposit, in exchange for 100% of the interests in the PFLLC. On November 24, 2000, the parents signed new wills incorporating a bypass trust, a qualified marital trust, and a GSTT-exempt qualified trust.

No additional assets have been contributed to the PFLLC since the initial funding in November 2000 and three deposits of Idaho Warehouse partnership distributions totaling $3,563, $2,578 of which was refunded to decedent by the PFLLC on December 12, 2003.

**[\*7]**   On November 24, 2000, the parents formed the PFT.  The PFT beneficiaries were the parents' descendants and the spouses of their descendants.  The PFT agreement provided the beneficiaries with Crummey withdrawal rights with respect to transfers made to the PFT, under which the beneficiary could annually withdraw the lesser of the annual gift exclusion amount of each person making a transfer to the PFT or a per capita share of the value of any assets transferred to the PFT during the year.  See Crummey v. Commissioner, 397 F.2d 82 (9th Cir. 1968), aff'g in part and rev'g in part T.C. Memo. 1966-144.

On December 28, 2000, the parents funded the PFT with a gift of $400,000, $354,000 coming from the PFLLC Bank of America account and the remaining $46,000 coming from the parents' personal Bank of America account.  On December 29, 2000, the PFT distributed $235,000 of the cash to the Purdue children and other PFT beneficiaries.  The remaining cash was distributed to the Purdue children during 2001.

Purdue Family Meetings

On June 14, 2001, the Purdue children held a combined meeting of the PFLLC and the PFT in their capacities as cotrustees of the PFT, coattorneys in fact for the parents, and members of the PFLLC on behalf of the PFT and the parents. The parents never attended any of these meetings.  The Purdue children met with

[*8] Mr. Montgomery and representatives from the Rainier Group, Inc. (Rainier Group), a professional management advisory firm, and agreed that an annual meeting would be held and that minutes and materials would be filed.

Since 2001 the Purdue children have held annual meetings in their capacities as trustees and beneficiaries of the PFT and the Purdue Testamentary Trusts, personal representatives and beneficiaries of the parents' estates, attorneys in fact for the parents, and individual members of the PFLLC. They discussed the Purdue family's accounts and assets, ratified prior PFLLC distributions, approved annual cash distributions, heard presentations from the Rainier Group investment manager, and received estate tax planning updates and advice from Mr. Montgomery.

Gift Giving

Before 2000 Mr. Purdue and decedent generally made annual cash gifts of $40,000 to each of the Purdue children and made annual cash gifts in other amounts to the Purdue grandchildren.

From 2002 until 2007 decedent generally made an annual exclusion gift of PFLLC interests to the PFT effective on January 1 of each year in an amount based upon the current number of PFT beneficiaries and then made an additional annual exclusion gift effective on December 31 of that year if the number of PFT

[*9] beneficiaries increased during the year or the value of the PFLLC fell during the year. The values of the PFLLC gift interests were based upon valuation summaries that Mr. Montgomery prepared except for the value of the September 30, 2002, gift, which was based upon Moss Adams Advisory Services' February 3, 2002, appraisal. Each year MBPA provided the Purdue children with withdrawal right waivers with respect to the prior year's gifts of PFLLC interests to the PFT, reflecting that all PFT beneficiaries had waived their withdrawal rights.

From 2001 to 2007 the Purdue children received, in approximately equal shares, cash distributions totaling $1,997,304 in their capacities as PFT beneficiaries. Of the $1,997,304 of PFT cash distributions, $51,920 was net rent paid to the PFT for its 50% interest in the Purdue residence and $1,945,384 was its share of net cash loans and dividends from the PFLLC.

Health of the Parents

Decedent was severely injured by a golf cart in 1984, sustaining complex, lower extremity fractures. She never fully recovered and was increasingly unable to walk safely without assistance. Complications from the injury and osteoporosis eventually caused her to become a semiinvalid unable to safely stand, walk, or be seated without physical assistance from caregivers.

[*10] Decedent suffered a stroke or transient ischemic attack on October 16, 2000. Decedent's treating physician believed the event was cause by a transient ischemic attack that was completely reversible and did not represent a stroke. He believed that there was no residual neurological impairment.

Decedent required in-home healthcare; from August 2001 until her death, she required 24-hour in-home healthcare. Except for the 1984 physical injuries and osteoporosis that limited her mobility, decedent suffered from no other chronic, terminal, or life-threatening diseases from 2000 through her death (no cancer, heart disease, or other similar illnesses), nor did she suffer from dementia, Alzheimer's disease, or any similar intellectual disability. The parents paid a caregiver $17,550 from June to November 2001 from the parents' individual bank accounts. From 2001 through 2007 decedent paid approximately $705,000, or $9,500 per month, to Family Resource Home Care for in-home healthcare from the parents' individual bank accounts.

Mr. Purdue died unexpectedly on August 3, 2001, but at the time of the formation and funding of the PFLLC, he appeared to be in good physical health and enjoyed an active lifestyle. However, Mr. Purdue's memory problems were evident to the Purdue children at the time assets were contributed to the PFLLC. He was later diagnosed with Alzheimer's disease.

**[*11]** <u>The Rainier Group</u>

The values of some telecommunication stocks, including AT&T Corp., experienced some volatility after September 30, 1999. By December 2000 the parents had questions about the previous large account "Short Against the Box" investment strategy under which a short position was taken, in what was then the AT&T Corp. and Liberty Media stocks, financed by a margin loan secured by the long position in the same stocks.

As early as January 2000 Mr. Montgomery spoke with the parents and certain Purdue children about engaging the Rainier Group to provide investment management services to the PFLLC and the parents. In January 2001 Mr. Montgomery referred the parents to the Rainier Group to explore investment management services to be provided to the PFLLC and the parents. In March 2001 the Rainier Group provided the parents with a proposal and engagement agreement offering to provide various investment management and advisory services to the parents and the PFLLC.

On April 4, 2001, Mr. Purdue signed the Consulting Services and Implementation Agreement with the Rainier Group on behalf of the parents and for the PFLLC. Rainier Group formulated an investment strategy for the parents and the PFLLC, outlined in the Investment Policy Statement dated July 1, 2001,

[*12] signed by Mr. Purdue, decedent, and the Purdue children. Thereafter, all the assets formerly held by the parents individually in the five accounts at three different management firms were consolidated into PFLLC accounts with the Rainier Group subject to an overall, well-coordinated professional investment strategy applied to all of the investments as a whole.

Additional Information

After Mr. Purdue's death in August 2001 his will established three trusts for the benefit of decedent, into which the value of Mr. Purdue's undivided 50% share in his and decedent's community property was transferred. The first of the three trusts established under Mr. Purdue's will was the Bypass Trust. The second and third trusts established under Mr. Purdue's will for the benefit of decedent were the Non-GSTT Exempt Qualified Trust and the GSTT-Exempt Qualified Trust (collectively, QTIP Trust).

Mr. Montgomery sent a letter to the Purdue children dated August 18, 2008, explaining the options for paying the estate tax liabilities, including a $6,245,744 loan from the PFLLC to the estate and the QTIP Trust or a $9,863,571 dividend from the PFLLC. The Purdue children's rights were limited. The members of the PFLLC could not transfer their interests without unanimous consent by the other members. Beverly refused to approve a PFLLC dividend sufficient for the estate

[*13] and the QTIP Trust to pay their estate tax liabilities with their proportionate shares in order to induce her siblings to approve a large lump-sum PFLLC dividend that she wanted but that they opposed (deadlock). For the same reason, she also refused to approve PFLLC dividends necessary for the QTIP Trust and the Bypass Trust to pay their income tax liabilities. The $5,040,090 of combined PFLLC dividend shares of the estate and the QTIP Trust was insufficient to pay their estate tax liabilities. The remaining distributees aggregated their distributions and made loans totaling $1,233,897 to the estate and the QTIP Trust.

At the time of her death, decedent individually owned approximately $3,228,125 of assets outside of the QTIP Trust and the PFLLC. The QTIP Trust's share of the combined estate tax liability was approximately $3,345,126 under the tax payment clause of Mr. Purdue's will, and the estate's share was approximately $2,928,861 under the tax payment clause of decedent's will. The PFLLC was owned as follows: 24.9247% by decedent outright; 42.1608% by the QTIP Trust; 20.7615% by the PFT; 7.2969% by the Purdue children; and 4.8561% by the Bypass Trust.

The estate timely filed its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on March 1, 2009. Respondent issued the estate tax notice of deficiency on February 21, 2012, and the gift tax notice of deficiency

**[*14]** for the taxable years 2001, 2002, and 2004 through 2007 on September 12, 2012.

OPINION

I. Burden of Proof

Generally, taxpayers bear the burden of proving by a preponderance of the evidence that the determinations of the Commissioner in a notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The estate has not argued or established that respondent should bear the burden of proof.

II. Whether Section 2036(a) Applies to Decedent's Transfer to the PFLLC

The purpose of section 2036 is to include the value of testamentary inter vivos transfers in the value of a deceased taxpayer's gross estate. United States v. Estate of Grace, 395 U.S. 316, 320 (1969). Section 2036(a) generally provides that if a decedent makes an inter vivos transfer of property other than a bona fide sale for adequate and full consideration and retains certain enumerated rights or interests in the property which are not relinquished until death, the full value of the transferred property will be included in the value of the decedent's gross estate. Section 2036(a) is applicable when three conditions are met: (1) the decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate and full consideration; and (3) the decedent

[*15] retained an interest or right enumerated in section 2036(a)(1) or (2) or (b) in the transferred property which he or she did not relinquish before death. Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).

Respondent argues that these three conditions were satisfied by decedent's transfer to the PFLLC, while the estate argues that the latter two conditions were not satisfied. The parties agree that decedent made an inter vivos transfer of property.

### A. Whether Decedent's Transfer to the PFLLC Was a Bona Fide Sale for Adequate and Full Consideration

In the context of family limited partnerships, the bona fide sale for adequate and full consideration exception is met where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership and the transferors received partnership interests proportional to the value of the property transferred. Id. at 118; see, e.g., Estate of Mirowski v. Commissioner, T.C. Memo. 2008-74 (applying Estate of Bongard in the context of an LLC). The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation. Estate of Bongard v. Commissioner, 124 T.C. at 118. A significant purpose must be an actual motivation, not a theoretical justification. Id. A list of factors to be considered

[*16] when deciding whether a nontax reason existed includes: (1) the taxpayer's standing on both sides of the transaction; (2) the taxpayer's financial dependence on distributions from the partnership; (3) the taxpayer's commingling of partnership funds with the taxpayer's own; (4) the taxpayer's actual failure to transfer the property to the partnership; (5) discounting the value of the partnership interests relative to the value of the property contributed; and (6) the taxpayer's old age or poor health when the partnership was formed. Id. at 118-119; Estate of Jorgensen v. Commissioner, T.C. Memo. 2009-66, aff'd, 431 F. App'x 544 (9th Cir. 2011); Estate of Hurford v. Commissioner, T.C. Memo. 2008-278. We separate the bona fide sale exception into two prongs: (1) whether the transaction qualifies as a bona fide sale and (2) whether the decedent received adequate and full consideration. Estate of Bongard v. Commissioner, 124 T.C. at 119, 122-125; see also Estate of Bigelow v. Commissioner, 503 F.3d 955, 969 (9th Cir. 2007) ("In * * * [the family limited partnership] context, we consider the 'bona fide sale' and 'adequate and full consideration' elements as interrelated criteria."), aff'g T.C. Memo. 2005-65.

1. Whether Decedent's Transfer to the PFLLC Was a Bona Fide Sale

Whether a transfer is a bona fide sale is a question of motive. Estate of Liljestrand v. Commissioner, T.C. Memo. 2011-259. We must separate the true

[*17] nontax reasons for the PFLLC's formation from those that merely clothe transfer tax savings motives.  See Estate of Bongard v. Commissioner, 124 T.C. at 121.

The estate argues that decedent had seven nontax motives for transferring the property to the PFLLC:  (1) to relieve decedent and Mr. Purdue from the burdens of managing their investments; (2) to consolidate investments with a single adviser to reduce volatility according to a written investment plan; (3) to educate the five Purdue children to jointly manage a family investment company; (4) to avoid repetitive asset transfers among multiple generations; (5) to create a common ownership of assets for efficient management and meeting minimum investment requirements; (6) to provide voting and dispute resolution rules and transfer restrictions appropriate for joint ownership and management by a large number of family members; and (7) to provide the Purdue children with a minimum annual cashflow.  Respondent argues that the PFLLC was a testamentary substitute and that transfer tax savings were the primary motivation for the formation and funding of the PFLLC.

### a. Testamentary Objective

Decedent transferred property to the PFLLC to simplify the gift giving process and to assure transfer tax savings.  Respondent claims that the PFLLC was

[*18] created only for tax savings and the other nontax reasons were purely hypothetical. While we agree with respondent that gift giving alone is not an acceptable nontax motive, we disagree that gift giving was decedent's only motive in transferring property to the PFLLC.

### b. Creation of Family Asset

Testimony at trial, coupled with the memorandum from MPBA and the PFLLC operating agreement, establishes that a significant purpose of decedent's transfer of property to the PFLLC was to consolidate investments into a family asset managed by a single adviser. Before the transfer, the marketable securities were maintained across five different brokerage accounts at three management firms, subject to individual advice from the three different management firms.

Following the formation of the PFLLC and formulation of an investment plan with the Rainier Group, the parents' assets were consolidated into PFLLC accounts with the Rainier Group subject to an overall, well-coordinated professional investment strategy applied to all of the investments. Before the formation of the PFLLC, Mr. Purdue handled all of the financial decisions regarding the marketable securities. After the formation of the PFLLC, the Purdue children made the PFLLC investment decisions jointly.

[*19] Although this transfer to the PFLLC was also made with testamentary purposes in mind, we have previously noted that "[l]egitimate nontax purposes are often inextricably interwoven with testamentary objectives." Estate of Bongard v. Commissioner, 124 T.C. at 121. We find that decedent's desire to have the marketable securities and the Hocking Building interest held and managed as a family asset constituted a legitimate nontax motive for her transfer of property to the PFLLC. See Estate of Schutt v. Commissioner, T.C. Memo. 2005-126 (consolidation of assets was allowed as a legitimate and significant nontax motive to further a buy and hold investment strategy); cf. Estate of Hurford v. Commissioner, T.C. Memo. 2008-278 (no advantage found to consolidating asset management where the partner's relationship to the assets did not change after formation of a family limited partnership).

### c. Other Factors

The estate concedes that decedent was advised of the transfer tax savings. Therefore, decedent discounted the value of the partnership interest relative to the value of property contributed, and this factor weighs against the estate.

Respondent argues that other facts show a nontax purpose did not actually exist. Respondent first argues that decedent stood on both sides of the transaction, as Mr. Purdue and decedent transferred all of the assets and there were no

**[\*20]** negotiations over the terms of the PFLLC operating agreement between the parents and the Purdue children. Respondent contends that the Purdue children did not retain an independent adviser or attorney to represent them in the formation of the PFLLC.

Where a taxpayer stands on both sides of a transaction, we have concluded that there is no arm's-length bargaining and thus the bona fide transfer exception does not apply. Estate of Liljestrand v. Commissioner, T.C. Memo. 2011-259; Estate of Strangi v. Commissioner, T.C. Memo. 2003-145, aff'd, 417 F.3d 468 (5th Cir. 2005). However, we have also stated that an arm's-length transaction occurs when mutual legitimate and significant nontax reasons exist for the transaction and the transaction is carried out in a way in which unrelated parties to a business transaction would deal with each other. Estate of Bongard v. Commissioner, 124 T.C. at 123.

We have already found the existence of a legitimate nontax motive for the transaction between decedent and the PFLLC. We also believe decedent received interests in the PFLLC proportional to the property she contributed. See id. Accordingly, this factor does not weigh against the estate.

Other factors, however, support the estate's argument that a bona fide sale occurred. First, decedent and Mr. Purdue were not financially dependent on

[*21] distributions from the PFLLC. Decedent retained substantial assets outside of the PFLLC to pay her living expenses. Second, aside from a minimal dollar amount across three deposits to the PFLLC account, there was no commingling of decedent's funds with the PFLLC's funds. Further, the formalities of the PFLLC were respected. The PFLLC maintained its own bank accounts and held meetings at least annually with written agendas, minutes, and summaries. Third, Mr. Purdue and decedent transferred the property to the PFLLC. Lastly, the evidence shows that decedent and Mr. Purdue were in good health at the time the transfer was made to the PFLLC. Although decedent was 88 at the time of transfer in 2000, she lived until 2007. Aside from the accident in 1984 and the incident in 2000, decedent never experienced any mental illness or life-threatening illnesses. Mr. Purdue was 83 at the time of the transfer and experienced symptoms of Alzheimer's disease. Otherwise, Mr. Purdue lived an active lifestyle until his death in 2001.

### d. Bona Fide Sale Issue Conclusion

After considering all facts presented, we find that decedent had a legitimate and actual nontax motive in transferring the property to the PFLLC. We therefore find that the bona fide sale prong is satisfied.

**[*22]**        2. <u>Whether Decedent Received Full and Adequate Consideration for Her Transfer to the PFLLC</u>

A taxpayer's receipt of a partnership interest is not part of a bona fide sale for full and adequate consideration where an intrafamily transaction merely attempts to change the form in which the decedent holds property. <u>Estate of Gore v. Commissioner</u>, T.C. Memo. 2007-169. We have stated that

> [w]ithout any change whatsoever in the underlying pool of assets or prospect for profit, as, for example, where others make contributions of property or services in the interest of true joint ownership or enterprise, there exists nothing but a circuitous "recycling" of value. We are satisfied that such instances of pure recycling do not rise to the level of a payment of consideration. To hold otherwise would open section 2036 to a myriad of abuses engendered by unilateral paper transformations.

<u>Estate of Harper v. Commissioner</u>, T.C. Memo. 2002-121, slip op. at 44-45. With regard to recycling of value, we have stated that when a "decedent employ[s] his capital to achieve a legitimate nontax purpose, the Court cannot conclude that he merely recycled his shareholdings." <u>Estate of Schutt v. Commissioner</u>, T.C. Memo. 2005-126, slip op. at 63.

We have already found that decedent had a legitimate and actual nontax purpose in transferring the property to the PFLLC. Therefore, we find that the transfer was not merely an attempt to change the form in which decedent held the

[*23] property and that the full and adequate consideration prong is satisfied.[2]

Estate of Stone v. Commissioner, T.C. Memo. 2012-48, slip op. at 18.

B.  Section 2036(a) Conclusion

We have found that decedent's transfer of property to the PFLLC was a bona fide transfer and that decedent received full and adequate consideration from the PFLLC as a result of the transfer.  Because decedent's transfer was bona fide and for adequate and full consideration, section 2036(a) is inapplicable to the transfer and does not operate to include the value of the property in the value of decedent's gross estate.  "[I]f section 2036(a) does not apply to decedent's transfer, section 2035(a) cannot apply to the gifts * * * [the PFLLC] made" either. Estate of Bongard v. Commissioner, 124 T.C. at 121.  Thus, the application of section 2035(a) is precluded by this holding.

III.  Whether Decedent's Gifts in 2001, 2002, and 2004 Through 2007 Were Gifts of Present Interests

The parties disagree as to whether the gifts of PFLLC interests are present interests and thereby qualify for the annual gift tax exclusion under section

---

[2]Respondent also argues that the undervaluation of PFLLC interests used to fund decedent's community share coupled with the non-pro rata distribution of Mr. Purdue's estate resulted in a taxable gift from decedent to the Purdue children in 2002.  Since we have found that the transfer was for full and adequate consideration, this argument is moot.

**[\*24]** 2503(b).  The estate bears the burden of proving that the gifts qualify for the annual exclusion.  See Rule 142(a); Hackl v. Commissioner, 118 T.C. 279, 289, (2002), aff'd, 335 F.3d 664 (7th Cir. 2003).

Section 2503(a) defines "taxable gifts" as the total amount of gifts made during the calendar year, less certain deductions.  Section 2503(b) provides an inflation-adjusted annual exclusion of $10,000 per donee for gifts "other than gifts of future interests in property", that is, for present interest gifts.  The term "future interest" includes "reversions, remainders, and other interests or estates, whether vested or contingent, and whether or not supported by a particular interest or estate, which are limited to commence in use, possession, or enjoyment at some future date or time."  Sec. 25.2503-3(a), Gift Tax Regs.  A present interest, however, is "[a]n unrestricted right to the immediate use, possession, or enjoyment of property or the income from property".  Id. para. (b).  The terms "use, possess or enjoy" connote the right to substantial present economic benefit, that is, meaningful economic, as opposed to paper, rights.  Hackl v. Commissioner, 118 T.C. at 291 (discussing Fondren v. Commissioner, 324 U.S. 18, 20-21 (1945)).  Therefore, to qualify as a present interest, a gift must confer on the donee a substantial present economic benefit by reason of use, possession, or enjoyment (1) of property or (2) of income from the property.  Id.  at 293.

[*25] The property in these cases is an ownership interest in limited liability company interests. A gift in the form of an outright transfer of an equity interest in a business or property, such as limited partnership interests, is not necessarily a present interest gift. See id. at 292; see also Price v. Commissioner, T.C. Memo. 2010-2. Rather, we must inquire, among other things, "whether the donees in fact received rights differing in any meaningful way from those that would have flowed from a traditional trust arrangement." Hackl v. Commissioner, 118 T.C. at 292.

When determining whether a gift is of a present interest, we examine all facts and circumstances as they existed on the date of the gift. See, e.g., Fondren v. Commissioner, 324 U.S. at 21-22. Thus, on each date of gift, the estate must show from all the facts and circumstances that, in receiving the PFLLC interests, the donees thereby obtained use, possession, or enjoyment (1) of the limited partnership interests or (2) of income from those interests within the meaning of section 2503(b).

With respect to the PFLLC interests themselves, the primary source of the donees' rights and restrictions to the use, possession, or enjoyment of the property is the PFLLC operating agreement. The donees' rights, however, are limited. The members of the PFLLC could not transfer their interests without unanimous

[*26] consent by the other members. Therefore, the donees did not receive unrestricted and noncontingent rights to immediate use, possession, or enjoyment of the PFLLC interests themselves. Instead, we will consider whether the donees received such rights in the income.

To ascertain whether rights to income satisfy the criteria for a present interest under section 2503(b), the estate must prove, on the basis of the surrounding circumstances, that: (1) the PFLLC would generate income, (2) some portion of that income would flow steadily to the donees, and (3) that portion of income could be readily ascertained. See Calder v. Commissioner, 85 T.C. 713, 727-728 (1985); see also Hackl v. Commissioner, 118 T.C. at 298; Price v. Commissioner, T.C. Memo. 2010-2.

First, the PFLLC held an interest in the Hocking Building, subject to a 55-year lease, expected to generate rent income, as well as dividend paying marketable securities. Second, the PFT made annual distributions from 2000 through 2008, totaling $1,997,304. Further, the PFLLC operating agreement and applicable State law impose a fiduciary duty on the PFLLC to make proportionate cash distributions sufficient for the QTIP Trust and the Bypass Trust to pay their income tax liabilities. See Wash. Rev. Code sec. 25.05.165 (West 2005) (specifying that partners are subject to the duty of loyalty, the duty of care, and the

[*27] duty of good faith and dealing); Estate of Wimmer, T.C. Memo. 2012-157;

Estate of Petter v. Commissioner, T.C. Memo. 2009-280, aff'd, 653 F.3d 1012 (9th

Cir. 2011). Lastly, as previously stated, the property of the PFLLC consisted of

marketable securities and the interest in the Hocking Building. The rent amount

for the Hocking Building was readily ascertainable from the lease and the

marketable securities were publicly traded. Therefore, the partners could estimate

the expected dividends. See, e.g., Estate of Wimmer v. Commissioner, T.C.

Memo. 2012-157.

Accordingly, the gifts qualify for the annual gift tax exclusion under section

2503(b).

IV. Deductibility of Interest on Loans From the PFLLC To Pay Estate Tax

The estate argues that the $20,891 in interest that accrued on the loans from

the PFLLC members to the estate was necessarily incurred by the estate and,

therefore, allowable as an administration expense deduction under section 2053.

Section 2053(a)(2) provides that the value of the taxable estate shall be determined

by deducting from the value of the gross estate such amounts for administration

expenses as allowable by the laws of the jurisdiction under which the estate is

[*28] being administered.[3] For an interest expense to be deductible, the loan obligation must be bona fide and actually and necessarily incurred in the administration of the decedent's estate and essential to the proper settlement of the estate. Secs. 20.2053-1(b)(2), 20.2053-3(a), Estate Tax Regs. The estate bears the burden of proof on this issue. See Rule 142(a); Welch v. Helvering, 290 U.S. 111.

The estate has met the burden of showing that the interest on the loans from the PFLLC members is deductible under section 2053. Respondent never contends that this was not a bona fide loan. Further, the facts prove that the loan was bona fide. The loan option presented by MPBA recognized the potential interest deduction but emphasized that the deduction was just a possibility. Moreover, Mr. Montgomery suggested the second option, taking the distribution from the PFLLC, as opposed to the loan. The PFLLC operating agreement required its members to vote unanimously to make decisions. Beverly Purdue created the deadlock by not voting for the recommended option, making the loan

---

[3]Neither party suggests that Washington law bars the executor of an estate from claiming an interest expense as an administration expense with respect to the estate. Therefore, for purposes of these cases, we find that the interest expense for which the estate claims a deduction was properly incurred under Washington law, despite the absence of evidence that it was specifically approved by a Washington court. See sec. 20.2053-1(b)(3)(ii), Estate Tax Regs.

**[*29]** necessary.  Accordingly, we find that the estate can deduct the accrued interest on the loan.

In reaching our holding herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.